Argument is Leonard v. Marion Police Pension Board. I'll counsel whenever you're ready. You may proceed. May it please the Court, Your Honor, as this case comes before you as a part of an illustrative review matter, it was a decision by the Marion Police Pension Board in regard to an application for a line of duty pension filed by Charles Leonard. Before it heard evidence, it rendered a decision. It denied that line of duty pension, and it did so on two bases. First, it concluded that when Mr. Leonard fell in the snow, that that was not the kind of risk that is special or peculiar to law enforcement, and therefore that aspect of line of duty pension application was not satisfied. Furthermore, and equally important to the conclusion of the administrative agency, was the conclusion that at the time of the fall, the Board concluded that Mr. Leonard had concluded his dispatch duties and was now in the process of acting as would be any other civilian that has been walking in the snow. Based on that conclusion, the Court concluded that while Mr. Leonard might well be entitled to a non-line of duty pension, he did not ask for that before the agency. Instead, he pinned all his relief on a line of duty disability pension, and the pension board did not meet that obligation. It did not present the evidence to show the connection between his injury and law enforcement and his assigned duties. In looking at this appeal, Your Honors, I think it's always good we've got to begin with where the standard of review is and what deference, if any, do you owe the administrative agency. You well know that findings of fact and conclusions of administrative agencies are presumptively in prime if they show true and correct. All the case law says that it's not for the appellate court or any reviewing court to substitute its judgment for the findings of an administrative agency, but instead to look to see if there is competent evidence in the record to sustain and support that administrative agency's findings. Here we submit there absolutely is indisputable such evidence. Now let me begin and put in the context of what was involved here. On the evening of February 14, 2008, there was snow on the ground and there was an alarm at the Crisp Mansion. Presumptively, something had set this off. Three officers were dispatched at that time. The first one to arrive was Mr. Linter. He arrived, got there by himself, he looked at the scene, saw a vehicle parked in the driveway, ran the license plate, was satisfied with what he learned from that, then got out of his vehicle and walked some 20 yards up to a building where there was a guest house and lights were on and he could see people inside. He knocks on the door, has them come out, begins to interview them. After he talks to them for some whatever length of time, he's satisfied that they're lawfully there. They've been playing in the pool and he's quite satisfied that they're there properly. He tells them they can go back into the building. He turns on his heel, walks the 20 yards, opens the door of his vehicle, falls in the snow and is injured. Now, he testified in this hearing and there's no dispute about that. Not once but at least three times that his purpose in letting them go was only presumed, not the end of his investigation but only a part of it, that he fully intended to go back to his vehicle and use the vehicle radio to call in the names of these two subjects that he interviewed. If the board had believed that, it would be my position today that the board would have been required under Illinois law to have awarded him and wanted him to be pensioned. In fact, that's the position we presented in the brief. If he was still in the act of performing his assigned duty, even though falling in snow is hardly a special risk of law enforcement, if he was still performing that act at the time of his fall, we would fully agree that he'd be entitled to the line of duty. So the radio communication between Leonard and the dispatch, didn't that confirm that he was running the vehicle tag at that time? Yes, when he arrived at the scene. So that was when he arrived, not when he was returning. That's right. When he arrived at the scene and before he exited his vehicle, he gets on his radio and calls dispatch and says whatever the license plate number is, I have this vehicle, and apparently the staff's on the phone with Leonard. Then he gets out of his vehicle, Your Honor, and then goes to the door and has these two subjects that he interviews. That's what happened. Now at that point, if we take his testimony that we have to credit it, that would certainly be the argument of the appellee in this matter, we have to credit that we have to disregard a number of facts that the board found more compelling and cause the board to discredit or not believe Mr. Leonard's testimony that he intended to call in these names when he got back to his vehicle after the interview. What are those facts? Well, first of all, he testified himself that he was satisfied as to who they were and why they were there. Secondly, a fact that is inconsistent with the idea that he hadn't completed his investigation is he doesn't use his portable radio back on his shoulder to find out if his names are appropriate. That's standard police procedure as shown in the record. Now, then what does he do? What's the third thing? Is it standard procedure to make that call with the radio that's on his back out there in the presence of the people that he's checking out? I'm sorry, I didn't understand the question. In other words, he's out there, it's snowing or whatever, the individuals he's interested in. I think you're right, it's cold. Yes, sir. Yeah, the individuals that he's interested in are here, he's here, he's got a radio on here or on his belt or whatever. Is it standard procedure to make that call in the presence of the people who you are interrogating? That's what I believe the record shows. You do not turn your back on subjects that you have suspicion of because you think they're potential criminals. What he did here was not that. He let them go back into the house. If they were an escape van, that option, if they had enough weapons, they would have had that. All those things are inconsistent with standard police procedure. I want to be clear to the court. We're not suggesting that he's not entitled to a light of duty pension because he didn't follow police procedure, only that the agency, these men of his administrative agency, concluded that those facts were inconsistent with his testimony and it didn't seem credible to them that what he said was, in fact, what was occurring. So in regard to your question, yes, indeed, it would have been appropriate for him to use that. That would have been standard procedure. Certainly not to turn your back on people that you were suspicious of. He walks 20 yards back to his car. He has the injury. Now, here's further evidence that I think is really quite compelling as to why the credibility of Mr. Leonard is not acceptable and it was appropriate for the board to discredit him. After he falls, it's his testimony and his premise in this case is that he would have gone ahead and called this in, but he couldn't do that because he was now wrenched his knee and his shoulder. He uses the portable packet at this point to call dispatch to say, I've been hurt. He doesn't tell the dispatch that this time there's anything more to be done. He just says, I've been hurt. The other two dispatch officers arrive separately. They both come up to him. When asked in this hearing whether or not he asked them to run these names or even gave them names, he acknowledged he did not. Now, Your Honors, if this were an incompleted investigation and the reason he didn't complete it was because of his fall, the logical answer would be that he would have told these two officers this needs to be done. He did not do that there. He did not do that at the hospital. When he was interviewed again at the hospital after being transported there for emergency care to be seen by Sergeant Burr, tell me about it, whatever. His recollection of that is he didn't even tell Officer Burr that he interviewed anybody at the hospital, let alone the names of anybody that needed to be examined. Now, on that same evening, the assistant police chief contacts and talks to Mr. Leonard while he's waiting to be discharged, and they have a telephone conversation. They talk about, it's in the records, 2.02 is the exhibit number. There's interaction about, yeah, I really got hurt. He says it in a profane way. I don't doubt that he was hurt, at least by what he was reporting, but he never says anything to the assistant chief. I went, hey, I didn't finish the job. There's work to be done. Can I ask you just real quick on the facts? What time of day was this again? I know it's in your record. Early evening. Early evening, but it was dark. Yes, sir. And was it snowing at the time? I don't think at the time. It had been snowing. It was still on the ground, but it was precipitation at the time. There's no question that there was snow cover and ice on the ground he was walking. Absolutely true. That's right. And he goes, he parks his car, parks the squad car where? In a field, in a parking lot, do you know? It's actually in a driveway. In a driveway. He parks the first vehicle, the one that was apparently owned by the occupants of the vehicle or operated by the occupants of the guest house, was first. He parks behind it, rolls the plate, and then after he gets the information that he wants in it, he goes up to the guest house where he sees the lights on. Now, does he go through a grass or sidewalk or was it snow shoveled? What was the condition? I don't know. Why can't it simply be that the guy's still answering the car until he gets back to the patrol car and sits down? You're going to send him out into a field in the dark at night. It's snowing. Maybe it's not snowing, but there's ice on the ground. Now, that isn't something each of us do every evening. And then he's walking back. Now, this is – I don't see why it just couldn't simply be his call is done when he sits back down in the patrol car, whether he calls in their names or not.  Well, let me try to address that. Okay. And at the same time, let me add to it the argument of the athlete that there was no 10-8 call, no call. It's clear as the sea. I know. Which is another issue that we might as well incorporate at the same time. You know, Mr. Leonard is still performing an act of law enforcement. If he was still investigating when he turns on his heel and heads back to his vehicle, as Your Honor was suggesting, then I think that he's entitled to a line of due repentance. Not questioning that. But Your Honor asked me, why couldn't it be that way? Well, it could have been. If he had concluded, he still had work to do. But if he had concluded, which the board found, if he was satisfied with what he had found, there wasn't any further investigation to be done, then he moved from the standpoint of performing an act to the act of a civilian walking in snow. Now, before I leave, I'm going to come back to your question, because I know you're still troubled by it. I can see it in your face. But in regard to the 10-8 call, that really, I think, is a red herring in this case. If he had called in when he fell and said, I'm hurt, I need help, and by the way, there's still work to be done, then we'd have something to deal with in the record. The fact that he doesn't call to clear the scene only means he didn't call to clear the scene. We don't know whether he intended anything more or not. We really do not. We can't conclude anything from that. Now, back to your question. Why can't it be that he was still in the act of performance? If the board had concluded that, that he was a matter of law enforcement procedures and whatever, that he was still performing an act of duty, that would have been a legitimate thing. Can your Honor say as a matter of law, however, that they're in error as a matter of law in concluding otherwise? I think not. But let me refer you to the case of the Podorsky case, kind of give you some guidance about that, because that deals with the very question your Honor is talking about, about continuation of assigned duties. In Podorsky, the plaintiff is a passenger in a vehicle. He's an evidence technician, an officer, and he's already done something on the way back to the office with somebody else driving. There's a stoplight, he's rear-ended, and now he asks for a line of duty pension. A lot of discussion in that, but in the court's discussion, it says that then the key focuses, what was he doing? What was his capacity at the time when he was rear-ended? And back to your Honor's point, what are the brief facts? I suppose to say that until he penates or until he finishes his paperwork or until he's back at the station or whatever else it might be, that he is still in a line of duty in anything that happens. But what you're saying is every time a policeman answers a burglar alarm and goes to it and clears the call because it's a false alarm, no matter, he's still, he's not on duty when he's walking back to the car or going back over the fence to get to the car or anything else. Well, I think he's still on duty, absolutely. Not on duty, but it is. Because your Honor, well, is that really a meaningless issue in terms of the plaintiff? I understand. But your Honor's question is, when does it stop? Doesn't that really come down to it? Yeah. All right. It would depend upon the act that was assigned. If we're talking about investigating a scene, when the officer has completed his investigation, he did so because his conclusion would be, I've done all I need to do. So when he gets out of the car and walks up to the house, he's in the line of duty, but then when he walks back to his car, he's not. Well, I think on these facts that's the case. On these facts, and back to the Fedorsky case, what happened was the clerk concluded that even though he hadn't finished his shift, hadn't finished the work that was contemplated for him on that day, he was in a capacity of sitting in a vehicle at a traffic light as you and I would be, not as a law officer. He was just in transit back to the office, back to his place of work, and the clerk concluded that that by itself was not an act that was special or peculiar or in the performance of an assigned duty. I think that's the same conclusion as we would have here. I hate to go off on it, but if a guy answers a call and he goes down in a ditch, down in a field, down to a creek, and then determines there's no investigation here, I'm done, I'm just going to walk back up this hill and to my patrol car. Well, he walks up a hill, passed stumps and slips, and falls back down the hill. Now, we all get to walk up the hill every once in a while, but our job doesn't send us down that hill into that creek to do this, and I've got to get back to my patrol car. Well, we sent him out in the middle of the night into ice and snow and asked him to get back to his patrol car. That's what I'm hung up on. I understand, and frankly, there are 12 cases in this area. There's not a great uniform analysis for me to advise the court about. I've done what I can, but in response to what we're talking about here, Judge, in the facts that you presented, there was a risk that he had that was special to law enforcement in that he was now in a ditch, and he did that as part of the performance of his duties. I don't know that it's necessarily different from the facts of this case, and I would argue that it is, because in this situation, all we know from the facts is that he was walking 20 yards on a driveway which had snow on it, just as you and I would walk in our driveways. That's not the same as being sent out into the woods in a blind field in a ditch and the like. I think there are differences here. Excuse me one second. I would probably agree with you if the guy went to the mall on a theft and he doesn't have a call and he walks back down the same hallway as all the other people at the mall and goes out and has an accident, but it just seems like he was in a little more jeopardy under the weather conditions and the footing. That's my point. I can't argue with Your Honor's conclusion except to say that there's no evidence to say that it was anything special on that day that there was snow on the ground. All I can tell you, that's all the evidence that's presented. Is there any case that defines what clearing the scene means? Because it seems to me that if he was on this private property, he hasn't cleared the scene until he's off the private property. Whatever happens, he falls down getting into his car. He's still on an investigation until he clears the scene. Well, I guess in response to that, I have no case to start with. I don't think there's any statute about clearing the scene, and when Judge Enos referred to that in his docket entry, I must say that I remain confused that there's nothing for the court to take a judicial notice of as a matter of law about clearing the scene. It wasn't even an issue in the case. I quoted to the court in my brief the entire language about this, which isn't about Teddy, but it's analogous to what counsel argument of appeal is about a Teddy call. This wasn't the focus of the case at all. Now, frankly, it's certainly an argument that there's time to think, but I'm just telling you, Your Honor, that I know of no law that says anything about what an officer has to do about clearing the scene or when he does it or not. I think that's part of why we give some of these decisions to administrative agencies, and this particular agency is made up of, this panel is made up of three police officers, two active and one retired, and a non-police professional. That's before they took part of it. The majority of it, in fact, the unanimous opinion of the board was that the burden was not met. We wouldn't be here if before he fell he had called in and said, here's the names, run them for me, and then he fell. He's still investigating at that point. I agree with that. You'd agree with that? I agree with that, absolutely. Absolutely, Your Honor. If we believe him that he was going to call these names in, that's enough, but that's not what the board did. The board did not credit that. It's self-serving testimony. If you believe it, then he's a winner. If you don't believe it, I think he does not prevail. It comes down to that. And who's the fact finder in this matter? It's the people that see the demeanor but have the expertise and do that, and that honestly is the issue before the court. The crux of it is if he was still performing an active investigation, he's a winner today. But I don't think it's a matter of law that this court can conclude that. That's all I have to say at this point. Thank you, Your Honors. Thank you, Counsel. Counsel? May it please the Court, Your Honors, Mr. Prosser, Madam Clerks, my name is Brian Zirkelbach, and I represent Officer Leonard in this appeal. I want to start by saying I think that His Honor very clearly and succinctly identified the difficulty with the Pension Board's argument in this case in that there was absolutely no evidence before the Pension Board at either hearing, at the October 13, 2009 hearing or the November 17, 2009 hearing, that Officer Leonard had completed his investigation. There's just none. The Pension Board in this case abused its discretion. It acted arbitrarily and capriciously when it failed to render a decision within 14 days of the October 13, 2009 hearing, as the Pension Board President stated he would do on the record, and when they conducted a second hearing on November 17, 2009 with the sole intent and purpose of finding some evidence which it could cite in its decision in support of a predetermined decision to deny this office of benefits. The reason I spent the first three pages of my brief reminding the Pension Board of its obligations as an administrative agency was to highlight to the Court the background in which these hearings took place. We have on paper, black and white, what was said and what was recorded in those hearings. But Your Honor's former President did have the opportunity to observe the demeanor of the Pension Board. It was clear in the October hearing, and we had an inkling going into it, that this Pension Board wanted to deny Officer Leonard his benefits even before hearing the evidence, which in part is why we prepared so thoroughly for that hearing and that the conclusion the Pension Board realized that the plaintiff had carried his work had done it overwhelming by the evidence. Instead of rendering a decision approving his benefits, they decided to get together to sign on their own volition to have a second hearing and produce evidence. Unfortunately, the evidence they produced in the second hearing only further confirmed the plaintiff at police position in this case that the investigation had not been completed. In support of its position at the second hearing, it produced two witnesses. The other two officers that were dispatched to the scene, Officers Wright and Officers Mott. They are heard on the dispatch, which I believe is Exhibit 2.01 or 2.02. I'm not sure which it is. There's nothing that precludes the Pension Board from convening a subsequent hearing, is there? There is not, Your Honor, at all. And also I would add that the fact that they conducted the second hearing in and of itself is not reason at all to either reverse the trial court or affirm the Pension Board. But it's important to the case because if the Pension Board is the finders of facts, yet they are prejudiced or they are biased, that goes to the fact-finding of their determinations that this call had been, quote, concluded. But Officer Wright and Officer Molitor, Molitor, by the way, is the officer they tried to use to establish the standard of care. Both of those officers testified they were the first to arrive and find Officer Meadow on the ground. Well, that's impossible. Either one arrived first or the other one did. In the communications with dispatch, you will hear very clearly Officer Leonard attempt to direct the other officers to his location and the difficulty they were having. This was an ice storm. This wasn't snow on the ground. This was at 10.30 p.m. on February 12, 2008. We had just had literally a five- to six-inch ice storm that blanketed Williamson County. Let me ask you this. Is there any written policy that to verify an identity, the police officer must not lose sight of them and can't go back to his car and use the radio? Not at all, Robert. And, in fact, I'll highlight something else, and that is the defendant board likes to use the term suspect, suspect, suspect. Officer Leonard should not have turned his back on those suspects. Officer Leonard did not think they were suspects. They were subjects. When he encountered them, they were inside the pool house in T-shirts and shorts, playing pool. They identified them as family members of the Crisp Mansion. They were completely unaware there had been a silent alarm or an alarm call at all. When Officer Leonard made engagement with them, they were surprised there was a police officer there. So engaging these two people who appeared to be there as subjects, not suspects who had no idea that there was a burglary alarm call, certainly didn't clear or satisfy this officer's investigation of that scene. It did not. If they said, you know what, we did it. We did have our key and we jingled the door. I know the alarm went off because this light flashed us. So sorry. That might be the evidence Officer Leonard needs to say, let me get on my pack radio. I guess if it's not midnight, icy and snowy, and hopefully everyone can hear me clearly, as opposed to let's go to my car where I have an element of safety because these folks know nothing about the burglary alarm and say, oh, just a false alarm. You have two officers struggling to get up a driveway. Just go ahead and turn around safely and go back to dispatch and go back to your patrol. That is not the facts in this case. Officer Leonard testified that he was scanning the area as he was going back to his car because he wanted to get these names out loud and clear. He wanted to get to the protection of his squad car. Did he ever disclose the names to anybody by dispatch? Not that I'm aware of. But also, I will add that Officer Wright and Officer Molitor both testified they don't remember their conversations with Officer Leonard. And so then Officer Molitor, the expert on police procedure, admits to me that, in fact, he violated police procedure because he didn't clear the scene. He didn't make sure it was a false alarm and not a true and active alarm. So here's their expert saying, you know, we had an injured officer, and based on our understanding, these two gentlemen in there, Officer Molitor agreed to appear to be subjects, not suspects, belong there. They've turned their attention on Officer Leonard. Now, what they did or didn't do, that's on them. And I think it's an example of no one had cleared the scene at that point. Officer Leonard, being injured, was in no position to try to clear it himself. He just wasn't. He was injured. And if he doesn't give every detail of what he did or was thinking at the time because of his injury, I think common sense is easy to understand that. What is in the record with regards to the weather conditions that night? Without a doubt, everyone agrees. It's not disputed that it was icy and snowy and that this was not just a blink. This was a serious ice storm that had come across Marion. I think it knocked power out. This was a serious weather issue for Williamson County and in Marion. So you're saying your client testified to that, the other police officers did? Absolutely, yes, sir. And the recording that is in the record documents that. You can hear the exchange between the accusers. These other two officers hadn't even arrived to where Officer Leonard was at, yet the pension board, without any evidence to the contrary, then jumps the gap and makes the determination, well, the call must have been cleared. Because he didn't use his PAC grade for violating the police procedure, the call must have been cleared. That is just nonsense. And I also don't agree, to be honest with you, Your Honors, that just even if the call is clear, and say it's clear with the PAC radio, standing outside, that by clearing the call and yet not getting to his car, like not climbing up out of the ditch, isn't still an act of duty. Getting off the property still isn't an act of duty. I'll quote Supreme Court Justice Clark in the 1986 decision of Johnson v. Board of Trustees when he said, the police officer engages in the performance of duty for the protection of life and property whenever he is carrying out the official orders or requirements of his office, whether he be patrolling, investigating an accident, or merely issuing a citation to a person on the street. That this idea of special risk, of being in hand-to-hand combat, high-speed chase, gun battle, is not necessary. That's Justice Clark. Justice Carmeier in the 2007 decision of White v. City of North Chicago, November 1, 2007, reminded the Pension Board that a court of review, while giving deference to an administrative agency's decision, it isn't balanced. Just because they say it's so doesn't mean there isn't a check or a balance on it. And I didn't cite the 2007 case of White v. City of Chicago in my brief because, factually, it involves a pre-existing injury and the issue of three positions concurring on disability, not necessarily on point here. But Justice Carmeier made a special effort to remind board members, he says, and this is on page 14 of the decision, we feel compelled at this juncture to remind board members that under the Pension Code, a pension board owes a fiduciary duty towards its participants and beneficiaries. And what he's saying there is there's something more than carte blanche on an administrative agency. What's the citation on that? That's 315 Illinois Decision 772, Your Honor. Could you submit that, Counsel, if you have any response to that? And I have a copy I can present to the court. And that's what this case really boils down to. But I would say that, in light of Justice Clark's opinion in the Johnson case, that Officer Leonard going back to his car, getting in his car, and going back on patrol is still in duty. These are the performance of duty of patrolling. Mr. Prosser has admitted that if this is simply a case of patrol, he's patrolling an assigned area, and Judge Ekes asked him about this in the argument, and he's injured, is he in the line of duty? And Mr. Prosser said yes. Even if he's on patrol, if it's an assigned patrol, he was assigned to investigate this call. When he was finishing this call, he was still going back out on patrol. There was nothing to say he was going back to the department on a coffee break. It's really this case boils down to a pension board trying to find whatever evidence it can to deny this man in the line of duty disability benefits. Thank you. Thank you. Counsel? Your Honor, the suggestion that the pension board was prejudiced against this applicant is an extremely serious charge that is wholly unsupported by anything in this record. It is honestly an affront to the agency to make such a claim, and I will only say this in response to that. What he thought about what the board was doing is he can have those private opinions, but to make a charge of the nature as presented to this court I find wholly inappropriate. Do you agree that there is no policy that says you have to use your radio, not lose sight of the potential people? Sure. That's customary, but that's it. Absolutely, Your Honor. It's like there's no policy about a lot of things, and the agency had to make a decision about whether they believe him as to whether or not he was acting properly or not. It doesn't matter. Even if he had violated the policy, as I mentioned before, that wouldn't be determinative of his rights to a disability pension. If he disregarded an explicit policy of the department, it wouldn't mean that he was not entitled to a disability pension. All that that was presented in the findings of the agency was that these are factors that just don't sync with the testimony that an applicant has presented. That's the issue. Now, counsel said I used the word suspects today. If I did, I don't know. I think I did use the word subjects repeatedly in the brief, but in any event, these men were being interviewed, and he wants to say to us and to you, Your Honors, that the agency was bound to accept his testimony that he intended to do other things when he got back to his vehicle. He wanted to make an investigation of them that he had not done. Now, as I've said, if you believe that and you think that it is contrary to the manifest way to the evidence, which is the standard overturned finding of fact by an administrative agency, then, of course, you will reverse, or you will support, affirm the decision of Judge Ickes, which reverses the decision of the administrative agency. But I don't think that when you have not one set of facts, but seven of them that are inconsistent with his testimony, that you can conclude that there is no confident evidence in the record for the agency to make the findings that it did. It's just simply not so. Now, the argument that has evolved today, and I think in fairness it's partly an elevation to Your Honors' question, is whether or not, well, even if he didn't plan to do anything, he still should be protected because he hadn't got back to his car and he wasn't back home, and therefore, let's get it. Not back home, to the car. Well, I think the applicant will push it even further, but in any event, at least he hadn't returned back. Now, comment was made just at the conclusion of Mr. Zirkelbach's comment that I had agreed that if he was patrolling, and if he were injured while patrolling, that he would be entitled to benefits. That's pretty much the decision of the Jones case, Your Honors. He's driving in a vehicle. He's on his way to do patrolling, and he gets injured in an automobile accident, and the court concludes that he's entitled to benefits, even though, obviously, we all have a risk of being victims of other bad drivers. But he was performing a duty. He was out there on the way. The Olm case, which is also cited in my brief, was where a guy was out riding a bicycle on a assigned patrol, and everybody knows that riding a bicycle is just not a special risk of being a police officer, but when you're wearing a uniform and you're out patrolling on a bicycle, the Olm court said that that was part of it, and he was entitled to benefits for that. We don't quibble or challenge those holdings, either one of them. Neither do I challenge the decision of the Johnson case by the Supreme Court. I'd be ill-advised to tell Your Honors that the Supreme Court didn't understand the law. Obviously, they did, but the Johnson court didn't say it When that officer crossed the street in Michigan Avenue and fell on a wet spot on Michigan Avenue, that he was entitled to a benefit because he was a police officer and he was in uniform, he was there in response to aiding a pedestrian, which was his duty. So he was in the performance of the duty. I guess the nice question that Your Honor would have raised or could have been raised to the facts is, what if he finished taking care of that pedestrian, had walked the other side of the street to get out of the sun or to get out of the rain or the snow, just because, assuming his purpose, was he then entitled to the benefits? I don't think if you read the Johnson case that you'd come to that conclusion because you're not performing it. Thank you for your time. Thank you, counsel. We appreciate the brief arguments, counsel. We will take the case under advisement.